# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

v.                                                   Case No. 10-CR-77

**DANTE HAMPTON**
    **Defendant.**

## DECISION AND ORDER

The government charged defendant Dante Hampton with possession of 500 grams or more of cocaine with intent to distribute. 21 U.S.C. § 841(a)(1) & (b)(1)(B). Defendant moved to suppress statements he made to law enforcement, arguing that the police used an improper "two-step" interrogation technique in order to circumvent Miranda v. Arizona, 384 U.S. 436 (1966), questioning him first, then providing warnings and having him repeat his earlier, un-warned statements. See Missouri v. Seibert, 542 U.S. 600, 609-10 (2004) (discussing the two-step process). I held an evidentiary hearing on the motion, at which the interrogating detective and defendant testified. The detective testified that he primarily asked "pedigree" questions of defendant prior to providing warnings, avoiding the subject matter of the investigation; defendant claimed that the detective interrogated him about the drugs prior to providing warnings, then continued the interrogation after reading him his rights. I find the detective's testimony more credible and decline to suppress the Mirandized statement under Seibert. However, I find that some of the detective's pre-warning queries extended beyond the sort of routine pedigree questions to which Miranda does not apply. Accordingly, I grant the motion in part and deny it in part.

## I. FACTS

On March 20, 2008, detectives Octavio Delgado and Glenn Bishop seized a suspicious package at the UPS facility in Milwaukee. The box was addressed to "Mike Davis" at an address on South 51st Street. After a drug detecting dog alerted on the package, police obtained a warrant and opened the package, discovering over 1000 grams of cocaine. Delgado then obtained an anticipatory search warrant for the residence on 51st Street and proceeded to deliver the package in an undercover capacity. The parties dispute what occurred thereafter.[1]

Delgado testified that he arrived at the 51st Street residence at about 1:00 p.m., knocked, and defendant answered the door. Delgado asked if defendant was Mike Davis, and defendant replied "yes." Delgado then handed defendant the box and left. At about 1:03 p.m., a tactical unit entered to execute the search warrant. The unit cleared the residence for people and weapons, which took about five to ten minutes. Delgado and Bishop entered after the tactical team secured the residence and discovered defendant, the sole occupant. Defendant was at the time handcuffed with plastic ties used by the tactical team. Delgado and Bishop later placed him in "real" handcuffs. The members of the execution team gathered their materials and debriefed, which took about twenty additional minutes, leaving only Delgado, Bishop, and defendant inside. Before leaving, the officers advised Delgado that they observed defendant put the package in the back of the house near some shrubs, and that he was the only person present.

At about 1:30 p.m., Bishop and Delgado spoke to defendant, attempting to establish his

---

[1] The parties agree on the preliminary facts sets forth in the preceding text.

identity and what he was doing in the residence. Defendant was at the time seated on a chair or couch in a front room near the kitchen. The detectives primarily asked so-called pedigree questions, i.e. name, birth date, and address. They also asked defendant if he had consent to be in the house; defendant replied that he did, and that the house belonged to a girlfriend. However, he was somewhat evasive about the girlfriend, providing two different names. The officers also asked about a van located outside, which had Illinois plates.[2] Delgado testified that they did not at that time ask defendant about the package.

Delgado testified that he and Bishop continued to search the house for the items listed in the warrant, which took about twenty minutes.[3] They also contacted the owner of the home, whom they were able to identify from police records; she told the detectives that she did not know "Mike Davis" or defendant or give him consent to be there. The detectives also tried to reach the girlfriend defendant named.

At 2:09 p.m., Delgado commenced a recorded interview of defendant at the 51st Street residence. He provided Miranda warnings, and defendant agreed to speak with Delgado. The interview continued at the police station.[4]

---

[2]Defendant told the officers he was from Illinois but seemed evasive about how he got there; he denied owning the van, which apparently turned out to be false.

[3]Delgado explained that his and Bishop's search differed from that of the tactical team; the tactical team looked for people and weapons, while the detectives looked for the items on the search warrant.

[4]Defendant agrees that the officers provided Miranda warnings about 2:09 p.m., which he waived. Although the parties did not at the hearing introduce the entire recorded statement, it appears that defendant did not provide an actual confession regarding the package. Nevertheless, the government indicates that it intends to use the statement in its case-in-chief. See Rhode Island v. Innis, 446 U.S. 291, 301 n.5 (1980) ("By 'incriminating response' we refer to any response – whether inculpatory or exculpatory – that the prosecution may seek to introduce at trial."). For his part, defendant clarified at the hearing that he seeks suppression

3

Delgado testified that he and Bishop were in plain clothes, and that their weapons remained holstered during their encounter with defendant. Delgado indicated that he did not deny any requests for food or bathroom breaks, or use any physical force or threats in dealing with defendant. Defendant appeared lucid and had no trouble understanding what was going on. Delgado denied asking defendant anything about drugs or the package or otherwise attempting to obtain information from defendant about the matter under investigation prior to providing Miranda warnings. He denied hearing Bishop ask any such questions either. Delgado indicated that he spoke to defendant briefly, less than ten minutes, before reading him his rights; during the rest of the roughly ½ hour between his entry and the provision of Miranda warnings he attended to other matters, such as searching the house, contacting the owner, running a wanted check, and calling for a conveyance for defendant.

Defendant told a different story. He said that on March 19 he came to Milwaukee to visit the Potowatomi casino, spending the night at a girlfriend's house on 51st Street. He indicated that the home was owned by a friend of his girlfriend. He testified that the next day a man arrived to deliver a package, which he was not expecting. The man asked if he was Mike Davis, and he replied "huh?" The man handed him the box, which he took and placed on the back porch. He tried to call the girlfriend about the box but could not reach her. A few minutes later the police arrived, put him on the ground, and placed him under arrest.

Defendant testified that after about ten minutes three plain clothes detectives entered, but about five other officers remained in the house as well. Defendant indicated that Bishop and Delgado approached and asked him about the package, and he replied that he knew

---

of both his pre- and post-warning statements to the detectives.

4

nothing about it. Defendant testified that Delgado suggested cooperation with law enforcement, with defendant delivering the package to someone else. Delgado also suggested that defendant could be released if he cooperated.[5] All of this, according to defendant, took place before he was provided with Miranda rights. Defendant said that Delgado obtained the recorder and provided warnings only after he (defendant) said he could take the package to "Sonya," a person he made up. He then reiterated this story during the recorded statement.

## II. DISCUSSION

### A. Applicable Legal Principles

In order to protect the Fifth Amendment right against self-incrimination, the police must advise an individual of certain rights prior to subjecting him to custodial interrogation. Miranda, 384 U.S. at 444. Statements obtained in the absence of warnings may not be used in the government's case-in-chief. Id. To implicate Miranda, the person must be both "in custody" and subject to "interrogation." United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996).

In the present case, the government concedes that defendant was in custody during the encounter with Delgado and Bishop, and I accept the concession. Members of the tactical team manacled defendant immediately on entering the residence, one member of the team stood guard by defendant while the others cleared the residence, and the detectives placed defendant in "real" handcuffs upon their entry. Defendant was not permitted to leave his spot

---

[5]Delgado admitted that he spoke to defendant about cooperating with law enforcement, and defendant indicated that he could deliver the package to its intended recipient, "Sonya." But, according to Delgado, this occurred after he provided warnings. Defendant did not, according to Delgado, mention Sonya before being Mirandized. Delgado specifically denied asking defendant who the package was intended for prior to providing warnings. He also denied that he and defendant had agreed on a method of cooperation prior to providing warnings.

5

in the front room and remained handcuffed during the encounter with the detectives inside the residence. See Sprosty v. Buchler, 79 F.3d 635, 643 (7th Cir. 1996) (finding, under somewhat similar circumstances, that the defendant was in custody during a warrant execution). The issues are thus (1) whether the detectives engaged in "interrogation" prior to providing Miranda warnings, and (2) whether defendant's subsequent Mirandized statement must be suppressed under Seibert.

### 1. Interrogation Prior to Warnings

Interrogation includes not just direct questioning but also any words or actions on the part of the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990); Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The "test is whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response." United States v. Hendrix, 509 F.3d 362, 374 (7th Cir. 2007).

Not all questions of a suspect in custody are off limits, however. Courts have held that the routine gathering of biographical data following an arrest does not ordinarily constitute interrogation under Miranda. See, e.g., United States v. Edwards, 885 F.2d 377, 385-86 (7th Cir. 1989); United States v. Monzon, 869 F.2d 338, 342 (7th Cir. 1989); see also Innis, 446 U.S. at 301 (excluding words and actions "normally attendant to arrest and custody" from the definition of interrogation). Such routine booking questions are allowed because, to an objective observer, they are not designed to elicit an incriminating response. Monzon, 869 F.2d at 842. This does not mean that any question asked during a booking or identification process is permissible; where the police should know that a question is likely to elicit an incriminating

6

response, that question cannot be asked absent Miranda warnings, even during booking. See Muniz, 496 U.S. at 602 n.14; Monzon, 869 F.2d at 342.

### 2. The Two-step Procedure

In Oregon v. Elstad, 470 U.S. 298, 300 (1985), the Supreme Court held that an officer's initial failure to administer the warnings required by Miranda does not, without more, taint a subsequent admission made after the suspect has been fully advised of and waived his Miranda rights. Although Elstad involved an officer's good faith failure to warn prior to the initial statement, some law enforcement agencies subsequently adopted an intentional, two-stage interrogation procedure, whereby an officer would elicit a confession, then, only after the suspect had confessed, read the Miranda warnings and have the suspect repeat the incriminating statement. The first, un-warned statement would be excluded, but the second (ostensibly) could be used court. See Seibert, 542 U.S. at 610-11 (plurality opinion) (discussing this tactic).

In Seibert, the Court addressed the use of this question first, warn later tactic. The Court declined to overrule Elstad and adopt an automatic rule of exclusion under the fruit of the poisonous tree doctrine. Id. at 612 n.4 (plurality). However, the Justices also declined to extend Elstad to cover this tactic. A plurality of the Court held that: "The threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function effectively as Miranda requires." Id. at 611-12 (plurality). Relevant factors include (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second interviews, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round

as continuous with the first.  Id. at 615 (plurality).

Concurring in the judgment, Justice Kennedy suggested a narrower approach, stating that: "When an interrogator uses [a] deliberate, two-step strategy, predicated upon violating Miranda during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps."  Id. at 621 (Kennedy, J., concurring).  While the plurality had concluded that whenever a two-stage interview occurs admissibility of the post-warning statement would depend on whether the Miranda warnings delivered midstream could have been effective – an objective inquiry from the perspective of the suspect, which applied in the case of both intentional and unintentional two-stage interrogations – Justice Kennedy would apply a narrower test applicable only in the infrequent case in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.  Id. at 622 (Kennedy, J., concurring).

The Seventh Circuit, in attempting to divine the controlling rule from Seibert, has noted that only two Justices appeared to endorse Justice Kennedy's intent-based test.  United States v. Heron, 564 F.3d 879, 884-85 (7th Cir. 2009) (declining for this reason to adopt Justice Kennedy's approach as the rule of the case under Marks v. United States, 430 U.S. 188, 193 (1977)).  In United States v. Stewart, 388 F.3d 1079, 1090 (7th Cir. 2004), the court stated that "at least as to deliberate two-step interrogations in which Miranda warnings are intentionally withheld until after the suspect confesses, the central voluntariness inquiry of Elstad has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second."  See also United States v. Stewart, 536 F.3d 714 (7th Cir. 2008) (appeal after remand).  In Heron, the court of appeals analyzed the challenged statement under both Justice Kennedy's intent-based approach and

8

the plurality's multi-factor approach. 564 F.3d at 886. Likewise, in United States v. Lee, No. 09-2698, 2010 WL 3271963, at *10 (7th Cir. Aug. 20, 2010), the court noted that two tests had emerged from Seibert, and it had yet to choose which test should govern. It then analyzed the issue under both tests, finding that they produced the same result.

**B.     Analysis**

    **1.     Pre-Warning "Interrogation"**

The parties dispute what occurred between about 1:30 p.m., when the detectives approached defendant, and 2:09 p.m., when Delgado provided Miranda warnings. As discussed above, defendant claims that the detectives interrogated him about the package and solicited him as a cooperator before Mirandizing him. Delgado testified that the detectives avoided all discussion of the package before providing warnings, focusing instead on pedigree questions. Based on demeanor and the other circumstances of the case, I find Delgado's testimony more credible than defendant's.

Delgado testified clearly and consistently, with no hint of evasiveness or equivocation. He demonstrated good recall of the day's events, consistently denying that he or Bishop asked defendant in any way about the subject of the investigation before providing warnings. Defendant's testimony, on the other hand, had problems. He demonstrated limited recall as to who spoke to him and when; he asserted the presence of an unidentified third detective, yet the record contains no evidence regarding that person; and he admitted lying to the officers about his ownership of the van and about "Sonya," a person he apparently made up. At the hearing, defendant argued that after the recorder came on he and Delgado simply recreated what they had talked about earlier, but he failed to point to any specific portion of the recorded

9

statement supporting such an argument.

I must therefore decide whether, under Delgado's version of events, the officers "interrogated" defendant between 1:30 and 2:09 p.m. Asking defendant his name, birth date, and address did not run afoul of Miranda. These are the sort of routine questions that courts have assumed do not constitute interrogation. See, e.g., Muniz, 496 U.S. at 600-02 (finding that questions regarding name, address, height, weight, eye color, date of birth, and current age did not constitute custodial interrogation); United States v. Jones, 266 F.3d 804, 812 (8th Cir. 2001) ("Requests for routine information such as name and address, which is necessary for basic identification purposes, is not interrogation for purposes of Miranda."); United States v. Dougall, 919 F.2d 932, 935 (5th Cir. 1990) (stating that questions regarding the suspect's name, birth information, address, height, and weight, not intended to elicit damaging statements, do not constitute interrogation); Edwards, 885 F.2d at 385 ("In our opinion questions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of Miranda."); United States v. Adegbite, 846 F.2d 834, 838 (2d Cir. 1988) ("We have held . . . that the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by Miranda, whether that solicitation occurs before or after Miranda warnings are given.") (internal citations omitted).

It could perhaps be argued that asking such questions in this case might have led to an incriminating response, for if defendant had said that his name was "Mike Davis" or that he lived at the 51st Street address his responses would have tended to link him to the package

of cocaine.[6]  See United States v. Disla, 805 F.2d 1340, 1347 (9th Cir. 1986) (holding that the defendant's response to questions regarding his residence should have been suppressed where the officer had preexisting knowledge of illegal behavior at the defendant's apartment); United States v. Lewis, 685 F. Supp. 2d 935, 938-39 (E.D. Wis. 2010) (finding, in a case where the defendant's link to the premises the police intended to search was important, that asking the defendant where he resided constituted interrogation).  But I do not think that is a reasonable construction of what happened here.  While the focus in determining whether a question constitutes interrogation is primarily upon the perceptions of the suspect rather than the intent of the police, the intent of the police is not irrelevant as it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.  Innis, 446 U.S. at 301.

Under the circumstances of this case, I find that the detectives' pedigree questions were reasonably designed to identify the person they had in custody, rather than to link him to the drugs.  The record shows that the detectives had not identified defendant before speaking with him, and that he appeared to be an out of state guest or visitor to the home.  Cf. Lewis, 685 F. Supp. 2d at 938 ("This was not a situation where the questions were designed to obtain biographical information; the police already knew who they had stopped, and they had information about where defendant lived and who he lived with.").  Given these circumstances, and the relatively brief nature of this questioning, I cannot conclude that the detectives should have reasonably known that their questions were likely to elicit an incriminating response.

---

[6]Defendant does not make this argument; rather, he contends that the police directly interrogated him about the package prior to providing warnings.  As discussed above, I reject that contention.

11

Rather, the questions are most reasonably construed as a "proper attempt to establish identity." United States v. Rabinowitz, 991 F. Supp. 760, 764 (W.D. Va. 1998).[7]

However, the detectives' additional, pre-warning questions about what defendant was doing in the residence and whether he had permission to be there went too far. While these questions may have served the purpose of ensuring that defendant was not a trespasser or otherwise up to no good in someone else's home, they were also reasonably likely to elicit an incriminating response. One can easily imagine a person in defendant's spot responding that he was there to receive a package, or that the home owner asked him to be there to accept a package. Such responses would link the speaker to the drugs in the box. Therefore, although I find that the detectives acted in good faith in this regard, I will exclude defendant's responses to the non-pedigree questions.[8]

### 2. Application of the Seibert Tests

While the detectives engaged in some limited "interrogation" prior to providing warnings, I see no reason to suppress defendant's recorded statement under either of the Seibert tests. First, the record contains no credible evidence that Delgado intentionally withheld warnings in order to extract a confession that he could then have defendant repeat after reading him his rights. As discussed above, I find that the detectives acted in good faith and scrupulously attempted to avoid asking questions about the package or cocaine before providing Miranda

---

[7]Although any statement taken in violation of Miranda that the government seeks to use may be suppressed, it is worth noting that defendant's responses to these queries appear, under the circumstances, to have been exculpatory rather than incriminating. He did not admit to being Mike Davis or residing in the apartment.

[8]It does not appear that defendant, in fact, made any directly incriminating responses to these questions either.

12

warnings. In other words, there is no evidence that the detectives used the two-step interrogation technique "in a calculated way to undermine the Miranda warning." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).[9]

Second, I find that despite any pre-warning interrogation, the warnings provided at 2:09 p.m. functioned "effectively as Miranda requires." Id. at 611-12 (plurality). The initial interrogation was brief, perhaps ten minutes, consisting primarily of pedigree questions, and there appears to be no significant overlap between the content of defendant's answers to those questions and the content of his recorded statement. While the same officer handled the entire interrogation, which began at the 51st Street residence and continued at the police station, there is no evidence that Delgado treated the recorded interview as a mere continuation of his pre-warning questioning of defendant. See id. at 615 (plurality). To the contrary, Delgado asked about the package and solicited defendant's cooperation only in the second interrogation.

It is also important to note that while the detectives waited about ½ hour to provide defendant with Miranda warnings, they spent just a fraction of that time speaking to defendant. During the remainder of this time they searched the house, took photos, determined the identity of and contacted the home owner, did a wanted check on defendant, and called for a conveyance. The amount of time spent actually questioning defendant was limited, and the officers avoided questions directly related to the matter under investigation. Delgado testified that he provided Miranda warnings as soon as he was ready to talk to defendant about the case. Under these circumstances, there is no basis for suppressing defendant's recorded

---

[9] Nor does the record contain any evidence of a law enforcement policy of questioning first, warning later.

13

statement.[10]

## III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 11) is granted in part and denied in part, as stated herein.

**IT IS FURTHER ORDERED** that this matter is scheduled for **STATUS** on **Thursday, September 30, 2010, at 4:30 p.m.**

Dated at Milwaukee, Wisconsin, this 13th day of September, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[10]Defendant does not argue that either his pre- or post-warning statements were involuntary, and the record demonstrates that he spoke to the officers of his own free will rather than as the result of abuse, intimidation, or deception. See Watson v. Detella, 122 F.3d 450, 453 (7th Cir. 1997). I accept Delgado's testimony that the detectives treated defendant well.

14